Filed 4/14/26  P. v. West CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JACQUELINE GABRIELLE WEST,<br><br>  Defendant and Appellant. | F086995<br><br>(Super. Ct. No. BF188340B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION[1]

This murder case involves the disappearance of two young brothers, Orrin and Orson, who were last seen alive in 2020 living in the household of defendants, Trezell and Jacqueline West. Defendants were the adopted parents of the missing boys. Orrin was four years old at the time of the events at issue, and Orson was three. Their bodies have never been found, and it is presumed they are deceased.

Law enforcement became involved on December 21, 2020, when Trezell called 911 to report that Orrin and Orson were missing. Trezell told authorities that the boys had been in the backyard about 20 minutes earlier and they must have wandered away. Despite extensive searching conducted that night and in the days that followed, no trace of either child was found.

The prosecution's case rested largely on circumstantial evidence, and on the testimony and pretrial statements of defendants' four other children. The day after the 911 call, law enforcement spoke with the defendants' four other kids, who had been staying with Trezell's parents for several days. In contradiction to defendants' statements, the other children reported they had not seen Orrin or Orson for several weeks, or longer.

Defendants' oldest child, Adrian, told authorities and later testified at trial that, months earlier, Orrin had experienced a medical emergency one night while in the defendants' care. According to Adrian, Orrin choked while sleeping. In the morning, defendants found Orrin while vomit was "coming out of his nose" and his "color was fading." Adrian reported that defendants decided not to summon aid when they found Orrin the following morning and they told Adrian to keep this incident a secret. His parents told him that they "took care" of Orrin's body. Adrian also testified that, a short

---

[1]     For clarity and to protect their privacy, we refer to certain witnesses, including minors, by their first names only. (Cal. Rules of Court, rule 8.90.)

time after Orrin's choking incident—and months before defendants called 911—Orrin's biological brother, Orson, disappeared from the home.

The trial evidence did not establish with precision the exact date on which Orrin and Orson were last in the home, or the precise sequence of events leading to their disappearances. The children's statements regarding when they last saw Orrin and Orson, and where the boys were believed to be, were very inconsistent over time. Those inconsistencies, including substantial discrepancies in Adrian's accounts regarding Orrin's medical emergency, were fully explored at trial.

Neither defendant testified at trial. Defendants presented a joint defense and maintained their innocence throughout the trial, suggesting that someone either abducted Orrin and Orson, or they wandered away and nobody knows what really happened to them. Defendants also challenged the adequacy of the police investigation and argued that the children's statements were unreliable and the product of manipulation from authorities.

In 2023, the jury convicted both defendants of second degree murder (Pen. Code, § 187, subd. (a))[2] and involuntary manslaughter (§ 192, subd. (b)) in connection with Orrin's presumed death but were hung on the homicide charges as to Orson. As to both Orrin and Orson, the jury convicted both defendants of felony willful cruelty to a child (§ 273a, subd. (a)). Defendants were also convicted of making a false police report (§ 148.3, subd. (a)), a misdemeanor.

For the murder of Orrin, Jacqueline was sentenced to prison for an indeterminate term of 15 years to life, and the sentence for the involuntary manslaughter conviction was stayed. A four-year sentence for the willful cruelty to Orrin was ordered to run concurrently. For her willful cruelty to Orson, Jacqueline received a consecutive determinate term of four years.

---

**2** All future statutory references are to the Penal Code unless otherwise noted.

On appeal, Jacqueline challenges the sufficiency of the evidence supporting her convictions for Orrin's homicide, as well as her conviction for willful cruelty to Orson. She also raises a claim of instructional error regarding aiding and abetting. We reject those claims.[3] However, we agree with the parties that the conviction for involuntary manslaughter must be vacated because it is a necessarily lesser included offense of the murder. Consistent with the disposition in Trezell's matter, we further conclude that the murder conviction (count 1) and felony child abuse conviction (count 3) are based on the same criminal act. Accordingly, we vacate Jacqueline's sentence and remand for resentencing. The trial court shall exercise its discretion under section 654 to determine which of the sentences for counts 1 and 3 must be stayed. As modified, we affirm the judgment.

## BACKGROUND

We summarize the relevant facts pertinent to the issues raised on appeal, viewing the record in the light most favorable to the judgment. (See *In re Jesus O.* (2007) 40 Cal.4th 859, 861; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### I.     The Family Relationships.

In 2020, defendants were married and living together with six children. The two oldest children—Adrian and Aidan—were defendants' biological sons. The remaining four children—Orrin, Orson, Devin and Damian—were adopted by defendants in April 2019. Defendants received a total of $4,000 per month in assistance for the adopted children, which was their primary source of income in 2020.

---

[3]     In the nonpublished companion case *People v. West* (F087184), we consider Trezell's claims on appeal. Identical to the present matter, we reject Trezell's assertion that insufficient evidence supports his murder conviction. We modify Trezell's judgment to vacate the involuntary manslaughter conviction in count 2, and we also remand his matter for resentencing so the superior court may exercise its discretion under section 654 regarding the convictions in count 1 (murder) and count 3 (willful cruelty to Orrin).

Orrin and Orson were biological half brothers sharing the same mother. They were four and three years old, respectively, at the time they were reported missing. Before being adopted, Orrin was known as Cinsere Pettus and Orson was known as Classic Pettus.

Damian and Devin are biological brothers. Devin was eight years old, and Damian was six when these events occurred.

In 2020, defendants homeschooled their children. The family started that year residing in an apartment in Bakersfield, California. In September 2020, the family moved to a home in California City. It was disputed at trial whether Orrin and/or Orson resided with defendants in the new home and, if so, for how long.

Before moving, the family resided near Jacqueline's mother, Maria, who lived in the same apartment complex. Trezell's parents, Wanda and Phillip, resided in Bakersfield.

## II.    The 911 Call.

On December 21, 2020, at approximately 5:41 p.m., Trezell called 911 to report that Orrin and Orson were missing from the family's home in California City. Trezell told authorities that the boys had been in the backyard about 20 minutes earlier and they must have wandered away. Law enforcement responded to the scene shortly thereafter.

Trezell told officers that he had been in the backyard gathering firewood from an adjacent lot, and Orrin and Orson had been playing in the backyard. Trezell expressed his belief that the boys had left the property through a back gate. Jacqueline similarly reported that the boys had been in the backyard while she was inside the house. She believed the boys must have exited through the gate.

5.

Officers extensively searched around the house and in the neighboring area.[4] On the night of the 911 call, law enforcement deployed search dogs in and around the property. The dogs did not alert to any scent of Orrin or Orson leaving the property, nor did they track any path beyond the fence line or into the surrounding neighborhood. Officers advised Trezell that night that the absence of scent strongly suggested the boys had not exited through the back gate as claimed.

That night, officers reviewed video surveillance footage from neighboring homes. The officers reported to defendants that the footage showed only defendants' van leaving and returning to the residence. The video did not show any children leaving the property on foot, and it did not show any other vehicle stopping near the home.

On the night of the 911 call, officers observed that defendants' demeanors appeared unusual. Defendants did not display any frustration, anxiety or anger. Jacqueline "seemed neutral." There were wrapped gifts under a Christmas tree labeled for Orrin and Orson, and they had stockings hung for them. Despite extensive searches conducted that night and in the days that followed, neither child was found.[5]

## III.   Defendants' Version of Events.

On the night of the 911 call, which was a Monday, officers interviewed defendants first at their residence and then later that evening separately at the police station. Defendants reported that all six children had been together on Saturday, December 19, 2020. According to defendants, the family had driven on that Saturday to the residence of Trezell's parents, where they had dropped off the four older children, who were going

---

[4]     During their search, officers saw chalk drawings on a concrete slab in the backyard. Trezell had claimed that Orrin and Orson were playing on that slab before they disappeared.

[5]     The California City Police Department has limited resources and manpower. Civilian searchers, members of the California Highway Patrol, and members of the Kern County Sheriff's Department all assisted in looking for the boys.

to stay there for a few days. Defendants claimed they had returned home on Saturday with Orrin and Orson.

Defendants claimed that, on late Monday afternoon, Orrin and Orson disappeared from their backyard. Before they called 911, they searched around their property and Trezell drove around the neighborhood in their van for approximately 10 minutes before returning to alert authorities.

## IV. Defendants' Inconsistent Statements Regarding the Gate.

On the night of the 911 call, defendants repeatedly expressed their belief that Orrin and Orson must have left through the back gate. During closing arguments, the defense continued to assert that the missing boys must have gone out this gate, and either somebody kidnapped them, or they wandered off.

During their various statements to law enforcement, defendants made inconsistent statements regarding the backyard gate. When officers first arrived on scene, the back gate was closed. Trezell initially stated that he believed he had left the gate open while gathering firewood but later expressed uncertainty about whether it was open wide enough for the boys to leave through it. At various times, he claimed that the gate was open the entire time, that it had been closed, that it was cracked open, or that he had closed it to keep the dogs inside. He asserted that Jacqueline must have closed the gate while he was in the van searching for the boys.

Jacqueline denied to law enforcement that she had closed the gate. According to Jacqueline, it was Trezell who had closed it. In subsequent interviews, she stated that the gate was usually locked, that the boys could not have opened it, and that it had been unlocked only because Trezell had opened it to retrieve wood. At different times, she stated that the gate was open, that it was closed and locked, or that "we" had closed it after noticing it was unlocked.

7.

At trial, an officer told the jury that the gate in question was metal and heavy. He said it was difficult to open and close, even for an adult.

## V.     The Other Children Provide a Substantially Different Account.

Trezell and Jacqueline consistently told law enforcement that all six boys were together with them when the four older boys were dropped off at Wanda and Phillip's residence on December 19, 2020. Defendants both claimed that Orrin and Orson had been asleep in the very back of the van during the drop off.

The day after the 911 call, an officer drove to the residence of Trezell's parents to speak with the other children. At about 8:00 in the morning, an officer spoke individually with each of the four kids. All four children denied that Orrin and Orson had been in the van with them when they drove to their grandparents' residence and were dropped off. The children indicated that Orrin and Orson had not been seen for weeks, and perhaps longer.

An officer testified at trial that the children's statements altered the course of the investigation. After receiving these statements, law enforcement began writing search warrants.[6]

Law enforcement reviewed surveillance footage showing part of defendants' residence from December 19, 2020. A detective only saw four children and defendants get into the van before they drove to Wanda and Phillip's residence. The detective could not identify the kids or their ages. It did not appear to the detective that anyone in the video was carrying a child, but he admitted that he did not know that for certain.

In a police interview, Wanda stated that she never saw Orrin or Orson in the van, but defendants had told her that they were in there sleeping. Wanda testified at trial that, when the four older boys were dropped off at her residence on December 19, 2020, she

---

[6]     A very long investigation took place. Defendants were not arrested until March 1, 2022.

8.

never saw Orrin or Orson. She assumed Orrin and Orson were with Jacqueline's mother. A short time after the other boys were dropped off, Wanda rode in the front passenger seat of defendants' van during an approximate 20-minute round trip to the bank, and she never saw or heard Orrin or Orson.[7]

Law enforcement retraced defendants' route home after they left Wanda and Phillip's residence on December 19, 2020. Law enforcement viewed surveillance footage from various commercial establishments where defendants had stopped. At no point were Orrin or Orson ever seen on camera. Trezell was often the only one who exited the van. On one of the stops, both defendants were seen inside a minimart about one minute apart.

## VI. The Initial Forensic Interviews with the Children.

On December 22, 2020, the day after the 911 call, law enforcement scheduled forensic interviews for each of the children. These interviews were requested because of the discrepancies between defendants' and the children's statements.

During the separate forensic interviews, the children indicated that they had not recently seen the missing boys and conveyed that Orrin and Orson had been absent from the home for a period of weeks, if not more. The children consistently stated during their respective forensic interviews that Orrin and Orson had not been present in the van on the prior Saturday when dropped off at their grandparents' residence.

## VII. Law Enforcement Confronts the Defendants with the Accounts from the Other Children.

Trezell could not explain why the other boys were saying that they had not seen Orrin and Orson in weeks. He continued to maintain that Orrin and Orson went missing

---

[7] The van had three rows of seats behind the driver's seat. Law enforcement found car and booster seats in each of the three rows. The very back row had three car or booster seats.

on the day he called 911. When told he was not showing any emotion about this situation, he claimed that he had cried when away from officers.

Jacqueline expressed surprise that the other children had claimed that Orrin and Orson were not in the van when they went to Wanda and Phillip's residence on Saturday or that they had not been seen for some time. As a possible explanation, Jacqueline asserted that the other children did not like Orrin and Orson. She also stated that she had previously told the other children to pretend that Orrin and Orson were not there or did not live with them because Orrin and Orson cried a lot.

When questioned about her lack of emotion, Jacqueline said she was emotional when away from the officers. She acknowledged that she would be "hysterical" if her biological children were missing. She said she loved Orrin and Orson, but it was "not the same."

After learning that law enforcement had spoken with the children, Jacqueline messaged Wanda with instructions to have the boys ask for a lawyer before further interviews.

## VIII. Video Surveillance Evidence.

Multiple neighboring surveillance cameras captured the exterior of defendants' home on the evening of the 911 call. A camera positioned across the street showed defendants' van leaving and returning, as well as the eventual arrival of law enforcement. The missing boys were never seen on this footage. Another camera from a neighboring residence captured defendants' front yard and the empty lot next door. This footage similarly showed the van departing and returning, but no children were seen.[8]

---

[8] Officers failed to seize or download some of the surveillance footage that they viewed on the night of the 911 call.

At trial, the lead investigator told the jury that he had watched a lot of surveillance videos in this matter. He testified that neither he nor anyone else saw anyone "casing" the defendants' residence.

Law enforcement obtained surveillance footage that showed defendants purchasing items at various commercial establishments on various days in September and December 2020. In each instance, either Trezell or Jacqueline were alone. Orrin and Orson were never seen with them.

## IX. The Backyard Neighbor Did Not See Orrin and Orson on the Day of the 911 Call.

A previous neighbor of defendants testified at trial. This neighbor had shared the backyard fence with the defendants in California City. Given the state of the fence, this neighbor had been able to see into defendants' backyard.

The backyard neighbor recalled that defendants moved into their home in September 2020. She told the jury that she never saw a lot of activity in defendants' backyard, just a man back there occasionally. Around dusk on the day of the 911 call, she saw a "black" man going in and out of the side gate collecting wood.[9] She told the jury that she never saw any children in defendants' backyard, including on the day of the 911 call.

## X. The Evidence of Physical Abuse.

During his forensic interview, Aidan was seven years old. He reported that Orrin and Orson cried a lot, and his father would sometimes spank them. According to Aidan, the adopted children sometimes bled from spankings inflicted from the metal part of a belt. Aidan said, "They just kept spanking the blood spot."

When speaking with law enforcement, Trezell initially denied spanking the children. He then admitted that he did spank them, first saying he only used his hands

---

[9] At trial, Trezell was described as a "black man" and Jacqueline as "a lighter Hispanic female."

and then stating he "maybe" used a belt before reverting to claiming he only used his hands. Trezell said the children sometimes lie, but he also said that they would tell the truth if asked about spankings.

Jacqueline initially denied spanking the children but later admitted that she did spank them. Jacqueline denied using any belts. Jacqueline stated that if Orrin or Orson were crying, she would make them sit until they calmed down.

At trial, Devin and Damian's older half brother, A.T., testified about events he saw while he was temporarily fostered by defendants when he was 10 years old. At that time, Devin and Damian were four and two, respectively.

A.T. told the jury that, when Devin and Damian cried, Jacqueline would sit on the ground with the child, wrap her legs around the child's legs, and wrap her arms around the child's neck in a choke hold. According to A.T., Jacqueline would scream at them while holding them down. A.T. testified that Trezell favored his own children and let them pick on Devin and Damian.

## XI. Adrian Discloses that Orrin is Dead and Orson Disappeared.

After the initial forensic interviews occurred, the children were removed from defendants' custody. Adrian was placed with a temporary foster caregiver. During that placement, Adrian made statements describing a choking incident involving Orrin. Adrian underwent additional forensic interviewing.

Adrian was 10 years old during his forensic interviews. He explained that a choking incident had occurred inside their apartment in Bakersfield before the family had moved to the new home in California City. According to Adrian, Orrin had died after he choked or threw up one night. Adrian believed this choking incident occurred around the time the family was starting to move.

Adrian reported that this incident occurred in the bedroom of the apartment in Bakersfield where all the boys shared a room. During the night, Adrian heard "weird

noises." However, Adrian said that Orrin and Orson often made weird noises, like burping. The next morning, Orrin "was on his belly covered in his blanket, and nobody saw him."

On the morning of the choking incident, Adrian saw that Orrin's "color was fading and there was throw up coming out of his nose." His parents found Orrin in this condition, and they were trying to wake Orrin up. His parents were crying when they found Orrin.

Adrian reported that, on the morning of the choking incident, his parents had asked him if they should "tell somebody or keep it a secret." His parents had asked if they should call an ambulance. Based on what his parents had told him, Adrian had believed that, if they said something, authorities would take away the children. As a result, Adrian told his parents that they should not call for help.

Adrian said that he had touched Orrin's body, and it was cold. His parents had been trying to wake him, and they felt him. His parents told him that Orrin was dead. According to Adrian, Orrin never woke up, and his parents flipped him over.

Adrian told the forensic interviewer, Sunya Barton, that he had promised his parents that he would not tell anyone about what had happened to Orrin. He did not know what happened to Orrin's body. His parents told him that they "took care" of Orrin's body. His parents began telling the others that they sent Orrin to grandma's house.

Adrian believed Orrin had thrown up because he drank too much. Because his parents did not want Orrin and Orson chewing with their mouths open, they had blended their food and put it into a bottle. Before they went to sleep, Orrin had stolen Orson's drink. Adrian reported that his parents told Orson to punch Orrin for revenge. Adrian believed Orson punched Orrin, but he was not in the same room at the time, and he did not see it. They all went to sleep, and it was later that night that Adrian heard the strange noises.

13.

Adrian confirmed to Barton that Orrin had died before the family moved to the new home in California City. During Orrin's choking incident, Orson had been in his crib, and Adrian reported that Orson was alive when the family moved. Adrian believed that his parents had taken Orson to his maternal grandmother about four days after they moved. According to Adrian, his parents took Orson away and Orson never came back.

Adrian reported that Orrin and Orson had cried a lot. He said that his parents would smack their cheeks and butts and sometimes used a paddle stick.

Adrian told Barton that he had thought Orson was at his grandma's house, but the news was reporting that Orson was missing. Adrian said that his father had lied and made up a story about the backyard. He said his parents were lying about Orrin, and he stated that he had not seen Orrin or Orson for months.

## XII. Jacqueline's Comments About the Possible Location of Orrin's and Orson's Bodies.

Detectives asked Jacqueline to disclose to them the location of Orrin's and Orson's bodies. During one interview, she made strange comments in this regard.

Jacqueline said two holes existed in their backyard, and she suggested that law enforcement could look in there. When asked if the boys were located there, she answered, "Maybe. Maybe. I don't know." She said that the two holes looked like graves, which she had never dug up. She said that bodies could be there.

A short time later, Jacqueline mentioned some flower beds in the backyard. She was asked if the missing boys were there. She replied, "Well, no. I, I would, I didn't bury them there." When asked if they were buried somewhere else, she denied it. When asked if her husband had buried them somewhere else, she answered, "I will say no." The detective responded, "You're gonna say no?" She replied, "Nobody knows. Nobody."

Throughout this interview, Jacqueline denied that either she or Trezell were involved in Orrin's or Orson's disappearances. She denied that either she or Trezell had killed them.

On December 23, 2020, law enforcement thoroughly searched defendants' backyard. A cadaver dog was involved in the search. There were two low mounds in the backyard, and an officer or agent removed a couple of inches of top layer. The dog then alerted on the two mounds. However, a subsequent search of that area found no human remains. At trial, the dog's handler admitted that the alert may have occurred due to contamination given the number of people who had been in the backyard.

On February 1, 2021, law enforcement used ground penetrating radar to search the defendants' backyard, and certain other locations. Nothing was detected or found.

## XIII. The Family's Trip to Bakersfield in Early December 2020.

During the investigation, law enforcement focused on events that occurred on or about December 5, 2020. On or around that day, defendants and at least some of the children drove to Bakersfield. There was no evidence that Orrin or Orson accompanied them on this trip.

On or about December 5, 2020, Jacqueline visited her mother, Maria, in Bakersfield. Based on representations from Jacqueline, Maria understood that defendants had dropped off all the children with Wanda for the day. Maria did not see either Orrin or Orson that day. Trezell did not stay with Maria and Jacqueline, who went to an establishment to eat tacos together.

Trezell's brother, Josiah, told the jury that he babysat defendants' children in early December 2020 for about two hours one day. Josiah resided in Wanda and Phillip's residence. Josiah testified that only the four oldest boys were dropped off. He never saw Orrin or Orson in December 2020.

Law enforcement located video footage from December 5, 2020, from various stores in Bakersfield.  Trezell was seen shopping alone.

## XIV. The New Cell Phones and the Lack of Pictures of Orrin and Orson.

Law enforcement seized defendants' cellular phones and computers.  Data was extracted from their electronic devices.  Law enforcement discovered that both defendants had deleted their Google histories from July 7, 2020, to December 31, 2020.

Law enforcement looked for images of Orrin and Orson on defendants' social media.  After September 2020, they found nothing that showed the missing boys.  A video from July 2020 showed Orrin and Orson at the apartment in Bakersfield.  Adrian had recorded this video.

Law enforcement learned that, in early December 2020, both defendants obtained new cell phones, and they changed their phone numbers.  Jacqueline threw her old phone away, claiming it was broken.  The old SIM card was discarded.

Jacqueline told law enforcement that, after she received her new phone in early December, she only had pictures of Adrian and Aidan, and she had nothing showing Orrin and Orson.  Aidan's birthday is December 17.  Jacqueline had no pictures on her phone of that birthday in 2020.  Trezell also had no pictures of Orrin or Orson on his new phone.

At trial, Trezell's mother, Wanda, explained that it was normal for Trezell and Jacqueline not to take pictures of their kids.  To law enforcement, Jacqueline explained that she transferred some pictures to her new phone, but she had been unable to transfer folders.  She said she did not normally take pictures of the adopted kids because social workers had previously told her not to post pictures of the foster kids on social media.  Jacqueline explained that, even after adoption, she had continued to not take and post pictures of the adopted children.

16.

At trial, a program specialist for Kern County Department of Human Services testified about the lengthy process needed to become a foster parent. This specialist was not aware of any rule that prohibited foster parents from providing photographs of a foster child to fellow family members.

## XV.    Biological Evidence.

Law enforcement took biological samples from various items inside defendants' house, and inside their van. Testing revealed that Orrin's deoxyribonucleic acid (DNA) was a contributor to the mattress found in one of the bedrooms in the home. This mattress had also been previously used in the apartment in Bakersfield. Orrin's and Orson's DNA each contributed to results found on different car seats inside the van.

Law enforcement used chemicals to look for blood in the house. Nothing was detected. The van was also processed for potential blood. Nothing of interest was found.

## XVI.   Defendants Give Interviews to the Media.

During the early stages of the police investigation, defendants gave at least one interview to media about the missing boys. An interview was played on television, which Adrian watched.

## XVII. Adrian's Grand Jury Testimony.

When he was 11 years old, Adrian testified in a grand jury proceeding. Adrian's testimony confirmed the choking incident, but he made very inconsistent statements about the timing of when Orrin and Orson were last seen. For instance, he testified that everyone, including Orrin and Orson, moved to California City. Adrian testified that Orrin and Orson had sat in the back of the family's van, and he initially stated that he last saw Orrin and Orson "when we were being dropped off at our grandma's" house a few days before Christmas.

Adrian confirmed that the choking incident had occurred in the apartment in Bakersfield. He had heard "like gagging" coming from where Orrin was sleeping.

Earlier, Orrin had taken Orson's bottle. Adrian had heard Orrin and Orson make gagging noises before, so it was not strange to him.

Adrian testified that his parents had checked on Orrin. They tried to wake him up. Adrian told the grand jury that his parents told him that Orrin then went to his maternal grandmother, who lived next to them. Adrian claimed that he next saw Orrin "a few days before Christmas."

When asked about Orrin's color fading, Adrian remembered that it had looked "like his skin was dry" like when you scratch the top of your hand, and you need lotion. Adrian said he did not think Orrin was breathing following the choking incident. He said he saw the vomit after he got up and went to homeschool and then came back to the room. He denied seeing any movement from Orrin on the morning he died.

Adrian testified during that grand jury proceeding that the family moved to California City a "little while after Orrin was dropped off." He explained that his parents brought Orrin back a few days before Christmas. He believed Orrin had stayed at his grandma's house for a while.

Adrian was shown a transcript of his initial statements to the officer, wherein he had reported that he had not seen Orrin and Orson in weeks. During the grand jury testimony, Adrian said he was not sure what he had meant. He then expressed doubt about whether Orrin and Orson were in the van with them when they went to Wanda and Phillip's residence.

Adrian listened to a portion of his forensic interviews where he had reported that his parents had told him Orrin was dead. While testifying, Adrian remembered that his parents had asked him if they should tell somebody. Adrian told the grand jury that his answer had been, "No." Adrian recalled that Orrin had been lying on the floor. His parents suggested that Adrian should go back to school. Adrian denied that his parents told him where Orrin went after that. He again claimed that his parents had told him that Orrin had gone to his maternal grandmother's residence.

18.

Adrian explained during the grand jury proceeding that Orson had been with them for about four days in California City. He testified that, when "Grandma Wanda" had watched them, his parents had said that Orson was at the other grandma's house. Adrian recalled that, a few days after moving to the new house, he had heard a bump in the night possibly from the hallway. Orson was there that day but not the next day. That was the last time he saw Orson. Adrian told the jury that his mother had told him that they had dropped off Orson at "Grandma Maria's" residence. Adrian later clarified that Orson disappeared about a week and four days after Orrin died, and Adrian never saw him again.

Adrian told the grand jury that he had seen interviews on television, and he believed his father was lying.

## XVIII. Adrian's Trial Testimony.

Adrian was 12 years old when he testified at trial. His trial testimony confirmed the choking incident, but he had numerous inconsistencies.

At trial, Adrian initially took the position that everyone, including Orrin and Orson, moved from Bakersfield to the new home in California City. He recalled that Orrin threw up while in Bakersfield, but he initially denied that anything had happened, testifying that Orrin had "looked pretty normal." At trial, he was not "really sure" what he had meant when he had previously said that Orrin's color was fading. He said he could not recall talking to his parents about what they should do with Orrin, and he was not sure if Orrin had been taken anywhere while they were living in the apartment in Bakersfield.

The prosecution showed Adrian his prior statements to law enforcement and his prior statements during the forensic interviews. Adrian then testified that he saw "throw up coming out of [Orrin's] nose." His parents had checked Orrin to see if he was okay. At trial, Adrian could not remember what Orrin had looked like at that time. He was not

sure if his parents had said anything to him about Orrin's condition, and he did not remember what happened next. He was "not really sure" what he meant by saying in the interview that Orrin's color was fading. At trial, he denied recalling a conversation with his parents about calling an ambulance.

Adrian then provided more detail about this incident, testifying that he had not wanted to call for help because "police" would show up and he was "scared of losing" his family. Adrian admitted at trial that his parents had told him there was a possibility that police would take the kids away if they came. Adrian agreed at trial that, at some point, he and his parents had decided to keep a secret about what happened to Orrin.

At some point during this sequence, his parents told him that Orrin was dead. Adrian agreed that he had observed his parents attempting to revive Orrin or help him but was not sure what he remembered seeing. When asked about CPR, Adrian said, "I believe it was something like that." Adrian testified that his parents had cell phones on the morning following the choking incident, but he never saw them call 911.

Adrian told the jury that he had no idea where Orrin's body went, and his parents never told him. He was not certain when the choking incident had occurred but agreed that it sounded correct that it was about a week before moving to the new house.

At trial, Adrian agreed that Orson had moved with them to California City, but he was not sure how long Orson had remained there. He testified that his parents had told him that Orson "went to grandma's house," and he believed Orson left shortly after they moved to California City. He recalled hearing a sound one night, like a soap bottle falling in the bathroom. That night, Orson was there. The next day, Orson was gone, and Adrian never saw him again.

Adrian told the jury that he saw his parents on television giving an interview. He knew his father had lied because Orrin was already dead. He agreed that it was hard to break the promise he had made with his parents and tell the police what had happened, and it was hard to be in the witness stand in front of his parents.

20.

Adrian told the jury that, when the move to the new house was occurring, Grandma Wanda came to the house. He believed his parents went to the old apartment with Orrin and Orson. Adrian was not certain if his father had Orrin and Orson when he returned from the apartment. After refreshing his memory from his grand jury testimony, Adrian agreed that his father went back to their old apartment to pick up Orrin or Orson, and they came to the new house.

Adrian told the trial jury that, because they were too little, Orrin and Orson did not go with them to Grandma Wanda's house for Christmas break. He denied that they drove with them in the van.

## XIX. The Trial Testimony of the Other Children.

The defendants' other three children testified at trial.

### A. *Devin.*

At trial, Devin was 10 years old. He recalled that Orrin and Orson lived with them in the house in California City, but he did not know how long they lived there. He remembered going to visit Grandma Wanda in December 2020 around Christmas time. He remembered his other brothers with him, but he could not recall if Orrin and Orson had been in the van. He could not remember speaking with an officer about Orrin and Orson.

After being shown his interview with the officer, Devin recalled telling the officer that the last place he saw Orrin and Orson was at the apartment, which he agreed was still true. He believed Orrin and Orson went to "our mom's mom's house." Devin testified that it was either Adrian, Aidan, or his parents who told him that.

Devin recalled that, at the house, he slept in a bedroom with Orson and Adrian. He thought he remembered Damian and Orrin sleeping with him on the floor in the house before the bunk beds were finished. He agreed that Orrin and Orson helped put up Christmas stockings in the house and helped decorate the Christmas tree there.

21.

At trial, Devin repeated that Orrin and Orson went with them to the house in the desert, but then they went to their maternal grandmother's house. He did not know when they left. He did not think Orrin and Orson had been with them when they went to Grandma Wanda's house.

**B.   *Aidan*.**

Aidan was nine years old at trial. At the start of his testimony, he could not recall either the apartment in Bakersfield, or Orrin and Orson. He remembered moving to the new house, and believed only his parents, Devin, Adrian and Damian had moved and lived there. Even after being shown a picture of Orrin and Orson, Aidan still did not remember them. He recalled his Grandma Wanda, but he did not remember going to her house around Christmas time in 2020, or the police showing up there. When shown his statements to the officer, he still could not recall that interview, and he could not remember what he meant regarding his statements to the officer about Orrin and Orson.

At trial, Aidan then recalled telling the officer that Orrin and Orson had lived with them in the apartment. He continued to agree at trial that Orrin and Orson had not lived in the house in California City.

Aidan could not recall who had disciplined him and his brothers when they lived in the apartment in Bakersfield. He denied ever seeing his father spank Orrin and Orson.

**C.   *Damian*.**

Damian was eight years old when he testified at trial. He initially told the jury that he could not remember if Orrin and Orson had moved with the family to the new house. He then thought they had moved with them, but he did not remember if they stayed with them or if they went to someone else's house. He believed he had shared a room with Orrin and Devin in the house. He recalled going in the van to Grandma Wanda's house around Christmas, but he could not remember who went.

When shown his prior testimony from the grand jury proceedings, he could not remember previously saying that, one day after moving to the new home, Orrin and Orson left. At trial, he did not know why he had previously said that.

Damian was shown his interview with the police officer. He recalled speaking with that officer, and he agreed that he had told the truth then. He could not remember why he had said that Orrin and Orson were in the house only for one day. He could not remember at trial what he had told the officer about who was in the van going to Grandma Wanda's house. He agreed he had told the truth then.

Damian then testified at trial that Orrin and Orson were in the new house for a "long" time. He agreed that everyone, including Orrin and Orson, helped decorate the Christmas tree.

## XX. When Other Family Members Last Saw Orrin and Orson.

Trezell's parents—Wanda and Phillip—and Trezell's younger brother—Josiah— testified at trial. They each told the jury that they had not seen Orrin and Orson in person since before the COVID-lockdown in March 2020 or since the family had moved in September.

Wanda explained that she does not use FaceTime and, as a result, she had no visual contact with the boys during the pandemic. During the pandemic, defendants would occasionally take the children to visit Trezell's parents. Wanda and Phillip explained to the jury that, when such visits would occur, the older boys would get out of the van, but Orrin and Orson would remain out of sight. Trezell and Jacqueline would claim during these visits that Orrin and Orson were in the back of the van, but Wanda never personally saw the boys during those encounters.

When the family moved from Bakersfield to California City in September 2020, Wanda arrived at the new residence on September 18, 2020, and she only observed the four older boys—Adrian, Aidan, Devin, and Damian. She did not see Orrin or Orson at

that time, and she assumed they were with their other grandmother, though she did not ask. Wanda further testified that she did not see Orrin or Orson at any point while she stayed in the residence from September 18 through September 20, 2020. Trezell and Jacqueline were gone much of the time, driving back and forth from the old apartment. They would often come back late at night.[10]

Jacqueline's mother, Maria, told law enforcement that she did not take care of the children and was unfamiliar with the missing boys, including their names, which she found difficult to pronounce.[11] Maria told law enforcement that the last time she saw the children was before the family moved to California City in September 2020. She further indicated that she did not watch Orrin or Orson in 2020, and she had minimal contact with the family during that period.

At trial, Maria testified that she did not regularly see the children, and she did not watch any of the children when the family moved. The defendants never told her that someone else was watching Orrin or Orson when they moved. At trial, Jacqueline's mother denied ever watching Orrin and Orson in 2020 around the time of the pandemic.

Maria testified that, after the family moved, she visited them briefly one day. She thought she saw "all" the children inside the house, but she was not really paying attention to them. She was only there for a few minutes.

## XXI. When Other Witnesses May Have Seen Orrin and Orson.

The jury heard conflicting accounts from witnesses who may have seen Orrin and/or Orson after the family moved in September 2020.

---

[10] Wanda rented a U-Haul truck for defendants to use during the move. Law enforcement never processed this truck for forensic evidence because, sometime after defendants used it, that truck was relocated to Arizona.

[11] Maria used the services of a Spanish interpreter during her trial testimony.

## A.    *The real estate agent.*

The family took possession of their new home on or about September 11, 2020. The real estate agent provided the keys to the house that day. At trial, the realtor believed that he saw one of the boys that was eventually reported missing, but he did not identify which one.[12]

## B.    *The pest control owner.*

Jacqueline told law enforcement that, the day after they moved into the California City home, a pest control company came to the residence and provided services. According to Jacqueline, all six children were present, and they had waited together in the van until the services were completed.

At trial, the owner of the pest control company confirmed that he had gone to defendants' home in California City on September 15, 2020. While there, the owner saw at least four or five kids in the house. The children were taken outside so he could spray inside the residence. The owner saw a baby carrier with a younger toddler, another kid being held by the hand, and a "couple of other kids exited the house on their own behalf."

Law enforcement spoke with the owner, who could not identify the children he saw that day. The owner recalled seeing a car seat in defendants' van and a child was in it. The owner specifically recalled seeing a toddler that day.

The jury learned that law enforcement did not contact this owner for about one year into their investigation. At trial, a lead investigator testified that the owner of the pest control company had told law enforcement that he saw six to seven children, and then four to five children, and then three to four children. The owner said he never actually counted the number of children.

---

[12]    According to Adrian during a forensic interview, Orrin was not present at the home in California City, but Orson was present when the real estate agent gave the family the keys to the new house.

C.    *The anonymous tip from Texas.*

During its investigation, law enforcement received a tip that the missing boys had been spotted in Arlington, Texas.  A woman claimed that she saw two little Black boys with a young Black woman and a man of white origin.  The boys were described as Orrin and "Orton."  This tip came in around May 2021.  The tipster said one boy was named Orson.  The tipster apparently spoke to one boy, who was crying and said his name was "Orton."  A man with him said his name was Derrick.

This tip was particularly relevant because, at times, the biological mother of Orrin and Orson had resided in Arlington.  At trial, their biological mother denied that she ever took the kids or had them taken.

The jury learned that an officer traveled to Arlington to follow up on the tip.  Law enforcement told the jury that this lead had been cleared.  A male resident who lived at the address in question testified in this trial.  He had lived at that location in Arlington for 14 years, including in 2020.  This resident testified that a neighbor had reported to the FBI that two boys in his house had looked like Orrin and Orson.  The resident denied that an "Orrin" or "Orson" had ever been at his house.

## XXII. The Wiretap.

In or around March 2021, law enforcement began a wiretap operation wherein officers listened to defendants' phone calls.  On March 14, 2021, Jacqueline was recorded speaking with her mother.  Maria made a comment about a missing sock.  Maria then equated her missing sock to being like the missing kids, and both Jacqueline and Maria laughed.

## XXIII. The Loud Noise at the Dumpster.

At trial, a resident of defendants' former apartment complex testified about seeing defendants on September 19, 2020.  She heard a very loud noise in a dumpster around 11:00 p.m.  It sounded like something very heavy had been dumped.  She recognized defendants and believed they had been responsible for the loud noise.  At trial, an officer

informed the jury that law enforcement never searched this dumpster. They had wanted to search the landfill but were denied due to a lack of funding.

## XXIV. The Defense Evidence.

Neither Trezell nor Jacqueline testified at trial. They presented a joint defense, and they maintained their innocence throughout the proceedings.

We summarize the defense evidence that is material to the issues raised on appeal.

### A.     *The psychologist.*

The defense called a psychologist, Susan Napolitano, Ph.D., to testify as an expert witness on behalf of both defendants. In general, Napolitano explained to the jury the goals of a forensic interview and the protocols in place to obtain unbiased information. She explained the dangers of an interviewer having false beliefs, or using leading or suggestive questions, which can negatively influence a child. She explained that cognitive dissonance can lead to a person filling in gaps to create a false memory. Napolitano told the jury that multiple forensic interviews of the same child in the same matter are very rare.

Dr. Napolitano was critical of how the officer initially interviewed the children at Wanda and Phillip's house on the morning after the 911 call. In her opinion, the officer used a lot of leading, vague and compound questions. It was also troubling that the officer had relied on the form based on section 26, which is used for child suspects. Napolitano was concerned that it was this officer who had first suggested to Adrian that a murder had occurred.

Dr. Napolitano believed that Adrian's first forensic interview had been well done in many respects. However, she believed that, during the subsequent forensic interviews, Barton, the forensic interviewer, had applied too much pressure on Adrian, she was too suggestive, and she had used leading questions. According to Napolitano, Barton's trial

27.

testimony showed that she (Barton) had believed Adrian was lying so she had a preconceived notion regarding the truthfulness of his communication.

Dr. Napolitano heard Adrian's grand jury testimony read to this jury. According to Napolitano, Adrian had multiple inconsistencies in his statements, including whether Orrin ever made it to California City. It was Napolitano's belief that Adrian's inconsistencies called into question the truth of his statements. Napolitano noted that, during both his grand jury testimony and his testimony in this trial, Adrian had started off as if nothing wrong had happened, and he then transferred.

The defense gave Dr. Napolitano a hypothetical based on facts that mirrored this case. She opined that it was best to have one forensic interview to avoid any risk of contamination between interviews.

## B. *The accident reconstructionist.*

The defense called an accident reconstructionist to testify. This expert enhanced the video quality from surveillance footage taken from defendants' neighbors on December 19 and 21, 2020. One neighboring camera was about 250 feet away from defendants' home.

The expert explained that the video was recorded at dusk, making it more difficult to see. Some of the enhanced video from December 19, 2020, was played for the jury. The expert observed that the enhanced footage showed a "larger person holding something."

Another enhanced clip showed some moving lights near defendants' residence, and a car passes by on the road. It appears that this car backs up and changes its direction. At another part of enhanced video, someone is seen opening the right door of defendants' van, but you cannot see the person that is opening the door. The expert explained that dark clothing reflects very little light.

The expert told the jury that, if Orrin and Orson were wearing dark-colored clothing, then it was possible they were not picked up in the video. The expert believed that law enforcement should have conducted an experiment under similar conditions to recreate whether the small children could be seen on the surveillance footage. However, the expert admitted to the jurors that he had searched the video to spot two small children, and he never observed them.

## DISCUSSION

### I. Substantial Evidence Supports the Conviction for Second Degree Murder.

In her first claim, Jacqueline contends that the trial evidence is insufficient to sustain her conviction for second degree murder for Orrin's death.

#### A. *The standard of review.*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

#### B. *The relevant law regarding second degree murder and a failure to act.*

With CALCRIM No. 401, the jury was instructed on general principles of aiding and abetting. The jury also received instruction under CALCRIM No. 520, defining second degree murder based on both express and implied malice. During closing arguments, the prosecutor made it clear that defendants' liability for murder involving

29.

Orrin was based solely on a theory of implied malice due to their failure to summon medical aid.

"Murder is the unlawful killing of a human being with malice aforethought." (*People v. Blakeley* (2000) 23 Cal.4th 82, 87, citing § 187, subd. (a), fn. omitted.)  Malice may be implied when a defendant intentionally commits an act, or fails to act despite a legal duty, with a conscious disregard for life.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Knoller* (2007) 41 Cal.4th 139, 143; see CALCRIM No. 520.)  When the prosecution's theory is based on a failure to act, it must prove that the defendant had a legal duty to act, breached that duty, and that breach was the proximate cause of death. (CALCRIM No. 520.)

In this matter, the jury was instructed that a parent has a legal duty to help care for a minor child, and that a failure to act causes death if the death was the direct, natural, and probable consequence of the failure and the death would not have happened without it.  The jury was told that a natural and probable consequence is one a reasonable person would know is likely to occur if nothing unusual intervenes, and causation must be evaluated considering all the circumstances established by the evidence.[13]

### C. *Jacqueline's arguments.*

Jacqueline acknowledges that she owed Orrin a legal duty of care.  She argues, however, that substantial evidence does not show she committed a life-endangering act— or aided and abetted in one—resulting in Orrin's death.  She contends that the prosecution's theory about her failure to seek medical help for Orrin fails to establish causation.  According to Jacqueline, the only reasonable inference to be drawn from the evidence is that Orrin died during the night, and there was nothing that could have been

---

[13]   The jury was instructed on causation using a "but for" formulation—that death was caused by a defendant's act or failure to act if it was the direct, natural and probable consequence of that conduct, and the death would not have occurred without it.  The jury was not instructed using "substantial factor" terminology.

done to save him when he was found in the morning.  She further asserts that no evidence demonstrates that she acted with a conscious disregard for life.  She argues that her conviction for murder must be reversed for insufficient evidence.

**D.**      ***The jury had ample grounds to find Jacqueline guilty of murder.***

Contrary to Jacqueline's assertions on appeal, the prosecutor did not rely on aiding and abetting to establish defendants' guilt for Orrin's murder.  The prosecutor labeled the defendants as abusive parents, but the prosecutor did not assert that physical abuse caused Orrin's death.  Instead, the prosecutor made it clear that this case was based on implied malice from defendants' collective failure to summon aid when Orrin was discovered dying.  In contrast, defendants never asserted to the jurors that Orrin must have died in the night during the choking incident.  Defendants also never argued to the jurors that nothing could have been done to save Orrin when he was found in the morning.  Instead, the trial defense took a very different approach.

Trezell's counsel suggested during closing argument that Orrin and Orson disappeared because someone abducted them.  Jacqueline's counsel asserted to the jurors that the boys were alive on the day of the 911 call, and they must have walked away through the back gate.  Jacqueline's counsel informed the jurors that the defense was not labeling Adrian a liar, just that he had been manipulated by authorities.

Based on the jurors' verdicts, it is apparent that they rejected defendants' various assertions and, instead, accepted the prosecutor's theory that defendants were the proximate cause of Orrin's death.  When viewed in the light most favorable to the judgment, this record contains substantial evidence from which a reasonable jury could conclude beyond a reasonable doubt that Jacqueline was guilty of murder.

Jacqueline's arguments largely depend on a finding that Orrin necessarily died during the night so that any failure to summon medical help in the morning could not have caused his death.  The jury, however, was not required to accept that view of the

31.

evidence. Rather, the jury could reasonably credit Adrian's accounts describing Orrin's condition as consistent with an ongoing medical emergency when defendants found Orrin in the morning, especially because Orrin's "color was fading" and vomit was coming out of his nose. Adrian reported that his parents were present when Orrin was in this condition and were assessing what to do, including whether they should call for an ambulance.

The jury was given an unanimity instruction, which required the jurors to all agree on the acts that supported the murder charge. Thus, the jurors are presumed to have all agreed on what actions or omissions supported a finding that Jacqueline committed murder. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30 [we presume a jury followed instructions from the court].)

Conflicts in Adrian's testimony were fully litigated at trial and resolved by the jury. It is not our role to reweigh the evidence, reevaluate witness credibility, or resolve conflicts in the testimony. (§ 1127; see *People v. D'Arcy, supra,* 48 Cal.4th at p. 293.) Where the evidence permits multiple reasonable inferences, as it does in this matter, it was the jury's exclusive province to determine which inferences to draw. Reversal is not warranted merely because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid*.) Consequently, we reject Jacqueline's position that we must adopt a finding that Orrin was already deceased and beyond all help when he was discovered in the morning.

The jury could reasonably conclude that a serious emergency involving Orrin occurred under defendants' supervision, and Orrin was alive when he was discovered in the morning. As the prosecutor asserted to the jury, Adrian's description that Orrin's color was fading, and vomit was coming out of his nose strongly suggested that Orrin was not yet dead. Indeed, defendants' discussion about potentially calling authorities, especially for an ambulance, strongly suggests that they understood a possibility still existed to assist Orrin.

Because Orrin's body was never recovered, the precise time and actual cause of his death cannot be determined. But the absence of that precision does not defeat causation. The law does not require such proof to a mathematical certainty. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 845; *People v. Scola* (1976) 56 Cal.App.3d 723, 727–728.) Instead, criminal liability turns on proximate causation—whether the evidence permits a reasonable inference that defendants' conduct, or their omission, set in motion a chain of events resulting in death as a direct, natural, and probable consequence, and death would not have occurred without it. (*People v. Cervantes* (2001) 26 Cal.4th 860, 865–866, & fn. 7; see CALCRIM No. 520.)

Here, the evidence permitted the jury to infer that Orrin was alive but in obvious and grave medical distress, defendants recognized the need for assistance, but they nevertheless chose not to seek help despite their legal duty to do so. From these facts, the jury could reasonably conclude that leaving a critically endangered child without care made death the foreseeable and natural result, and that the fatal outcome would not have occurred when it did had defendants filled their duty.

Adrian's description that Orrin was cold to the touch was a lay observation, not a medical determination, and there is no evidence in this record that established that being cold to the touch conclusively demonstrated irreversible death hours earlier or foreclosed the possibility of effective medical intervention. In fact, the jury heard evidence supporting a contrary inference, including Adrian's descriptions of fading color and vomit coming out of Orrin's nose, defendants' discussion whether to call authorities— including an ambulance—their attempts to wake or revive Orrin, and their subsequent behavior in concealing this incident.

Adrian explained that, shortly after the choking incident, Orson disappeared one night from their residence, and Adrian never saw him again. Defendants instructed Adrian to keep the choking incident a secret. They lied to their family about Orrin's and Orson's whereabouts. Indeed, the children initially reported to law enforcement that they

believed the missing boys were at their other grandmother's house, a belief that was consistently attributed to what their parents had told them. At trial, however, Jacqueline's mother testified that she never watched Orrin or Orson in 2020. Nothing in this record demonstrates or even reasonably suggests that the missing boys were with Jacqueline's mother at any time.

Based on the jury's verdicts, the jurors determined that defendants made a false 911 call and lied to authorities. Likewise, defendants made false representations to the media about the circumstances surrounding Orrin's and Orson's disappearance. Adrian saw at least one news report and realized his parents were lying.

Jacqueline volunteered to law enforcement that there were "two holes" in the backyard resembling graves where the missing boys might be located. When pressed, she stated that she did not bury the missing boys there and later added that nobody knew their location. A cadaver dog alerted on those two mounds in the defendants' backyard, but human remains were not discovered.

Our high court has recently reiterated that a mere suspicion of guilt is insufficient to support a conviction. (*People v. Collins* (2025) 17 Cal.5th 293, 307 (*Collins*).) Our high court explains that the weight of the evidence must be considered before a reviewing court may defer to the jury's conclusions drawn from the record. (*Ibid.*) Here, the totality of the circumstances permitted the jury to reasonably infer that defendants knew they were responsible for Orrin's death. Defendants instructed Adrian to keep the choking incident secret, and they concealed Orrin's and Orson's whereabouts from family and authorities. They provided false accounts to law enforcement and the media and perpetuated a fabricated narrative that the children were with relatives, but nothing at trial demonstrated or even reasonably suggested that anyone else ever watched the children in 2020. Jacqueline's unsolicited statements about "two holes" in the backyard resembling graves, coupled with the cadaver dog alerting at that location, further supported a reasonable inference of consciousness of guilt. Taken together, this evidence

does not amount to mere suspicion or speculation. Instead, it supplied sufficient weight for the jury to conclude beyond a reasonable doubt that defendants deliberately concealed the homicide they committed.

Finally, in her reply brief, Jacqueline cites *Collins, supra,* 17 Cal.5th 293. She argues that *Collins* fundamentally undermines the prosecution's case and compels reversal of her murder conviction. We disagree.

*Collins* involved an implied malice murder conviction based on a mother's failure to protect her child from another person's fatal abuse. (*Collins, supra,* 17 Cal.5th at p. 300.) In the specific context of a parent's failure to protect a child, *Collins* clarifies that "liability for murder on a failure-to-protect theory is appropriately reserved for individuals who actually know to a substantial degree of certainty that a life-endangering act is occurring or is about to occur and failed to act in conscious disregard for life." (*Id.* at p. 310.)

Contrary to Jacqueline's assertions, *Collins* did not impose a "heightened" mens rea requirement. Rather, it reaffirmed the traditional implied malice standard and emphasized that criminal liability for murder based on an omission must rest on actual awareness of a grave risk to life—not mere negligence, mistake, or hindsight. (*Collins*, *supra*, 17 Cal.5th at pp. 309–311.) In the case where another person is inflicting harm, or will do so, a parent's failure to act can imply malice only if there is a substantial degree of certainty that life-threatening harm is present. At that point, it can be said that the defendant's choice to do nothing has been made with a conscious disregard for that life. (*Id.* at p. 310.)

*Collins* does not require reversal of Jacqueline's murder conviction. The jury could reasonably infer that Orrin experienced a medical emergency while in defendants' care, defendants found him in medical distress, Orrin was still alive when found, defendants recognized the seriousness of his condition when they considered calling for help but they consciously decided not to alert authorities, and Orrin's death was the

direct, natural, and probable result of that failure to act. The totality of this record amply supports the jurors' conclusion that Jacqueline held the requisite mens rea for murder, and that she was a proximate cause of Orrin's death. This evidence is reasonable, credible, and of solid value. Accordingly, substantial evidence supports the murder verdict, and this claim fails.[14]

## II. Alleged Instructional Error was Harmless.

With CALCRIM No. 401, the jury was instructed on general principles of aiding and abetting. The jury also received instruction under CALCRIM No. 520, defining second degree murder based on both express and implied malice.

Jacqueline argues that the instruction on aiding and abetting failed to convey the mental state required for murder liability under a theory of implied malice. She asserts that the jury was permitted to convict her for Orrin's death as an aider and abettor even if she did not hold her own mens rea for murder.

To establish instructional error, Jacqueline relies primarily on three opinions which have found fault with CALCRIM No. 401 for its failure to convey adequately the mens rea required for an aider and abettor to be liable for murder under a theory of implied malice: (1) *People v. Powell* (2021) 63 Cal.App.5th 689; (2) *People v. Langi* (2022) 73 Cal.App.5th 972; and (3) *People v. Maldonado* (2023) 87 Cal.App.5th 1257. These opinions have identified an ambiguity when CALCRIM No. 401 is used in implied malice murder cases because the instruction states that an aider and abettor must act with the "intent to commit the crime," which may be misunderstood to require only an intent

---

[14] The parties agree, as do we, that the involuntary manslaughter conviction in count 2 must be reversed because it is a necessarily included offense of the murder conviction, which is supported by substantial evidence. (*People v. Munoz* (2019) 31 Cal.App.5th 143, 153 ["Involuntary manslaughter is a lesser included offense of murder"].) Because substantial evidence supports the murder conviction, we need not address Jacqueline's contention that the trial court erred when it denied a motion for judgment of acquittal under section 1118.1 based on alleged insufficiency of the evidence.

36.

to assist the perpetrator's conduct, rather than the aider and abettor possessing their own subjective awareness of a life-endangering risk and conscious disregard for human life. (*Powell*, at p. 714; *Langi*, at p. 982; *Maldonado*, at pp. 1265–1267.)

This trial occurred in 2023, and defendants were sentenced in September of that year. After this trial concluded, the CALCRIM instructions were revised to clarify the mental state required for an aider and abettor involved in an implied malice murder. This amended instruction makes clear that, for an aider and abettor to be liable for implied malice murder, the perpetrator must commit an act that is dangerous to human life and which caused the death of another person, and the defendant knew that the perpetrator intended to commit that act, the defendant intended to aid and abet the perpetrator in committing that act, the defendant knew that act was dangerous to human life, the defendant deliberately acted with conscious disregard for human life, and the defendant did in fact aid and abet the perpetrator's commission of the act. (CALCRIM No. 526.)

Respondent takes the position that, based on the totality of the record, instructional error did not occur. Respondent also contends that *Powell*, *Langi* and *Maldonado* were wrongly decided, and we should not follow them. In the alternative, respondent argues that any alleged instructional error is harmless.

We need not resolve whether instructional error occurred because, even if we assume—without so deciding—that error occurred, this claim nevertheless fails due to a lack of prejudice.

We agree with the parties that we must analyze prejudice under the harmless-error standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). *Chapman* is triggered because the asserted instructional error could have permitted Jacqueline's conviction for murder under a theory of aiding and abetting without the jury finding the required mental state beyond a reasonable doubt. Under *Chapman*, the government bears the burden to show beyond a reasonable doubt that the assumed error did not contribute to the verdict. (*Chapman, supra,* at p. 24.)

37.

Jacqueline argues that the prosecutor's closing argument created a pathway for the jury to convict her under an aiding and abetting theory, thus bringing into issue the disputed instructional language appearing in CALCRIM No. 401. She points to a portion of closing argument in which the prosecutor stated that defendants wanted to keep the choking incident secret because they had inflicted injuries on Orrin, which led to his death. Jacqueline asserts that this statement, combined with the aiding and abetting instruction, allowed the jury to convict her based on Trezell's role as the primary disciplinarian. We do not agree.

Although the prosecutor did assert that defendants had been abusive to the children, the prosecutor did not present abuse as the basis for murder liability. Rather, the reference to abuse explained a possible motive for secrecy and concealment after Orrin's condition was discovered. The prosecutor made it abundantly clear that murder liability was based on defendants' collective failure to summon aid, that both defendants were present when Orrin was found in severe medical distress, and they both deliberately failed to act despite a known legal duty. Murder liability was framed as arising from each parent's own failure to perform a legal duty, not from one parent assisting the other's conduct.

Viewed in context, the closing argument did not present the jury with competing theories of guilt. Although the prosecutor did mention, in general, the concept of aiding and abetting, the prosecution did not ask the jury to determine who inflicted an initial injury or to assign murder liability based on aiding and abetting another's abusive conduct. The theory of murder was singular: both defendants were direct perpetrators who knowingly failed to seek medical help for a child in mortal danger. The prosecutor's closing argument, read as a whole, did not invite the jury to convict Jacqueline of murder based on a theory of aiding and abetting.

Moreover, Orrin and Orson were in defendants' exclusive care, and both boys disappeared from the home without any trace. Both boys are presumed dead. The

evidence overwhelmingly supports the conclusion that Jacqueline acted with her own conscious disregard for Orrin's life. Thus, it is beyond any reasonable doubt that the jury would have convicted Jacqueline of murder for Orrin's presumed death had it received a more complete aiding and abetting instruction, such as what is currently found in CALCRIM No. 526.

Finally, the jury's verdicts themselves confirm that any presumed instructional error regarding aiding and abetting played no role in its determination of Jacqueline's guilt for murder. In count 3, the jury convicted her of willful cruelty to Orrin in violation of section 273a, subdivision (a). The record reflects that the only theory of liability for the willful cruelty involving Orrin was defendants' failure to summon medical aid when Orrin was in distress. By returning a guilty verdict in count 3, the jury necessarily found that Jacqueline willfully caused or permitted Orrin to be injured under circumstances likely to produce great bodily harm or death, and she was criminally negligent in causing him to suffer or be injured. (CALCRIM No. 821.) That verdict strongly reinforces that the jury's murder conviction rested on Jacqueline's own culpable omissions and mental state.

Based on the totality of this record, the government has established that any presumed instructional error under CALCRIM No. 401 was harmless beyond a reasonable doubt. It is abundantly clear that the jury did not convict Jacqueline of murder based on a theory of aiding and abetting. In any event, even if the jury had relied on principles of aiding and abetting, it is beyond any reasonable doubt that a properly instructed jury would have nevertheless found Jacqueline guilty of murder. Consequently, this claim fails due to a lack of prejudice. (See *Chapman, supra,* 386 U.S. at p. 24.)

**III.  We Vacate the Conviction for Involuntary Manslaughter in Count 2.**

For Orrin's death, the jury convicted Jacqueline of both second degree murder (count 1) and involuntary manslaughter (count 2).  The parties agree, as do we, that, because substantial evidence supports the murder conviction, the involuntary manslaughter conviction must be vacated.

A defendant cannot be convicted of both an offense and a necessarily lesser included offense based upon the commission of an identical act.  In such a situation, the lesser included offense must be reversed.  (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)  "Involuntary manslaughter is a lesser included offense of murder."  (*People v. Munoz, supra,* 31 Cal.App.5th at p. 153.)

Jacqueline's convictions for murder and involuntary manslaughter were both based on the same act, her failure to summon help when Orrin was found in distress.  Accordingly, we vacate the conviction in count 2.

**IV.  Substantial Evidence Supports the Jury's Verdict of Child Abuse in Count 6.**

In count 6, Jacqueline was convicted of felony child abuse of Orson (§ 273a, subd. (a)).  Jacqueline argues that no evidence supports a finding that she directly inflicted abuse on Orson, knew of and permitted abuse by Trezell, or aided and abetted any acts likely to produce great bodily harm or death.  She seeks reversal of this conviction.

**A.  *The standard of review.***

To resolve this claim, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence, including circumstantial evidence, from which a reasonable jury could find Jacqueline guilty beyond a reasonable doubt.  (*People v. D'Arcy, supra,* 48 Cal.4th at p. 293.)

**B.  *The elements of section 273a, subdivision (a).***

Section 273a, subdivision (a), makes it a felony when "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes

or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered."

Felony child abuse pursuant to section 273a includes both active and passive conduct, such as child abuse by direct assault and child endangering by extreme neglect. (*People v. Valdez* (2002) 27 Cal.4th 778, 784; see also CALCRIM No. 821.) Ordinary negligence will not suffice, but must be aggravated, culpable, gross, or reckless—that is, such a departure from what the conduct of an ordinarily prudent or careful person under the same circumstances would be as to be incompatible with a proper regard for human life, or an indifference to consequences. (*Valdez*, at p. 788.)

With CALCRIM No. 821, the jury was instructed that the prosecution had to prove that (1) defendants willfully caused or permitted Orson to suffer, or willfully caused or permitted him to be placed in a situation likely to produce great bodily harm or death; (2) defendants acted with criminal negligence; and (3) defendants were aware of circumstances that would lead a reasonable person to realize the danger to Orson.

The term "great bodily harm" was defined for the jury as a "significant or substantial physical injury." The term "willfully" was defined as an act done willingly or on purpose. Criminal negligence was defined as (1) a person acting in a reckless way that is a gross departure from how an ordinarily careful person would act in the same situation; (2) the person's acts amount to disregard for human life or indifference to the consequences of his or her acts; and (3) a reasonable person would have known that acting in that way would naturally and probably result in harm to others.

The jury received an unanimity instruction for all charged crimes, including the felony child abuse in count 6. The jurors were told that the prosecution had presented evidence of more than one specific act to prove that defendants had committed the offenses. They were instructed that they could not find Jacqueline guilty unless they all

41.

agreed that the prosecution had proven that she had committed an alleged act, and they all agreed on which act she committed.

### C.     *The facts from this matter.*

Respondent argues that the prosecution's theory of felony child abuse as to Orson was rooted in the circumstances of Orson's disappearance and the inference that the defendants were responsible for Orson's presumed death.  The record contains substantial evidence supporting that characterization.

During closing arguments, the prosecutor characterized defendants as abusive parents, and the prosecutor recounted some of the specific abuse that had been inflicted on the adopted children.  Later, the prosecutor linked the felony child abuse counts to the homicide charges, describing the child abuse charges as "lesser" or "alternative" counts.  The prosecutor argued that, after Orrin's homicide, defendants killed Orson, who had been a witness to Orrin's death.  The prosecutor concluded by arguing that Orrin and Orson "were killed by two abusive parents."

Viewed in the light most favorable to the judgment, substantial evidence supports the finding that Jacqueline willfully caused or permitted Orson to be placed in circumstances likely to produce great bodily harm or death.  Substantial evidence also supports the finding that she failed to protect him under those circumstances.

The jury could reasonably consider the circumstances surrounding Orson's disappearance in evaluating whether he had been placed in a life-endangering situation.  Orson disappeared while in defendants' exclusive care.  Orson vanished without any credible explanation shortly after Orrin's homicide.  According to Adrian, within days of the move to California City, and after the choking incident involving Orrin, Adrian heard a strange noise one night in their home in 2020 and the next day Orson was gone.  Orson has never been seen again.  The jury could reasonably infer from the totality of the circumstances—including Orson's young age, his dependence on his caregivers, the long

42.

passage of time since he was last seen, and the absence of any credible explanation for his whereabouts—that Orson was exposed to circumstances likely to produce great bodily harm or death.

Defendants' conduct following Orson's disappearance further supported the jury's inference that Orson did not simply wander off or disappear through innocent means. The evidence showed efforts by defendants to conceal information about Orrin's and Orson's whereabouts. They lied to family members. They made a false 911 call. They lied to the media. This conduct provides additional circumstantial evidence from which the jury could infer culpability rather than an innocent explanation for Orson's disappearance. From these circumstances, the jury could reasonably infer that Orson's disappearance—occurring shortly after Orrin's homicide and while Orson was in defendants' exclusive care—resulted from willful conduct or omissions that placed him in circumstances likely to produce great bodily harm or death.

Jacqueline argues that the jury's inability to reach a verdict on the murder charge involving Orson forecloses any attempt to sustain her felony child abuse conviction by reference to Orson's presumed death. According to Jacqueline, the government has simply rebranded a failed homicide theory as felony child abuse, and the resulting verdict rests on speculation about a killing the jury did not find. We disagree.

Jacqueline's argument—that the hung murder count negates the evidentiary basis for felony child abuse—rests on an incorrect premise and does not reflect the statutory elements of section 273a, subdivision (a). To convict under this statute, the jury was neither required to find that Jacqueline murdered Orson nor determine the precise mechanism or moment of his death. Rather, the statute criminalizes willfully causing or permitting a child, while in the defendant's care or custody, to be placed in circumstances likely to produce great bodily harm or death, when done with criminal negligence. (§ 273a, subd. (a); CALCRIM No. 821.) The jury was entitled to find that Jacqueline's conduct satisfied those elements based on the evidence and the reasonable inferences

43.

drawn from Orson's disappearance and the circumstances under which he was last known to be in defendants' exclusive care, even though the jury could not unanimously agree on the separate charge of murder.

Finally, Jacqueline contends that affirming her felony child abuse conviction contravenes *Collins*, which rejected murder liability based on the natural and probable consequences doctrine. (*Collins, supra,* 17 Cal.5th at p. 319.) Her reliance on *Collins* is misplaced. Jacqueline's conviction under section 273a rests on her own conduct and omissions—causing or permitting Orson to be placed in circumstances likely to produce great bodily harm or death while in her care—not on imputed murder liability for another person's act. Therefore, *Collins* does not undermine the verdict here.

Viewed in the light most favorable to the judgment, the record contains substantial evidence from which a rational jury could conclude that Jacqueline, while having care and custody of Orson, willfully caused or permitted him to be placed in circumstances likely to produce great bodily harm or death, and she did so with criminal negligence. Under section 273a, subdivision (a), the jury was not required to find a precise injury or mechanism of death. It was sufficient that the evidence showed Orson disappeared while in defendants' exclusive care shortly after Orrin's homicide, Orson was never seen again, and that Jacqueline's conduct—including her participation in concealing Orson's whereabouts and her false statements to others—supported a reasonable inference beyond a reasonable doubt that she willfully exposed Orson to circumstances posing a grave risk to his life. Because substantial evidence supports the jury's verdict under section 273a, subdivision (a), we will not disturb it on appeal. This claim fails.

**V.**     **Because the Convictions for Felony Child Abuse and Murder are Based on the Same Act, We Remand for Resentencing so the Court May Exercise Its Discretion under Section 654.**

For the child abuse conviction in count 3 involving Orrin, Jacqueline received a sentence of four years in prison, which was to run concurrently to her indeterminate sentence for Orrin's murder in count 1.

Section 654 prohibits multiple punishment for a single act or course of conduct that violates more than one statute. Where all offenses are incident to one objective, the defendant may be punished for only one of them, and execution of sentence on the remaining counts must be stayed. (§ 654, subd. (a); *People v. Correa* (2012) 54 Cal.4th 331, 337.)

In Trezell's appeal, respondent properly concedes that punishment for the felony child abuse count involving Orrin must be stayed because it involved the same conduct that supported the murder conviction in count 1. Jacqueline does not raise this claim in her appeal. However, on the court's own motion, we address this legal issue now in the interest of judicial economy.

Jacqueline's convictions in counts 1, 2, and 3 are based on the same conduct, her failure to summon medical aid for Orrin. We have already vacated the conviction in count 2 because involuntary manslaughter is a lesser included offense of murder. Because the same act supports the convictions in counts 1 and 3, section 654 prohibits multiple punishment and requires that execution of sentence be stayed on one of those counts.

Under amended section 654, the sentencing court has discretion to determine which sentence should be stayed. This could result in the trial court imposing and executing the shorter sentence rather than the longer sentence. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) At sentencing in this matter, the trial court imposed a concurrent four-year term on count 3. Although the court's decision to run the felony child abuse term concurrently suggests it would not stay the sentence for murder, nothing

45.

in the sentencing record affirmatively shows how the trial court would have exercised its discretion under section 654. Accordingly, we remand for resentencing so the trial court may determine in the first instance which sentence must be stayed under section 654. We express no opinion regarding how the court should exercise its discretion.

## DISPOSITION

The judgment is modified to vacate the conviction for involuntary manslaughter in count 2. The sentence is vacated, and the matter is remanded for resentencing.

On remand, the trial court shall resentence Jacqueline and exercise its discretion under section 654 to determine which sentence to stay. Specifically, because count 1 (murder) and count 3 (felony child abuse) are based on the same act, the court shall impose sentence on both counts but shall stay execution of sentence on one of them pursuant to section 654. Following resentencing, the trial court shall prepare amended abstracts of judgment and forward them to the appropriate authorities.

As modified, the judgment is affirmed.


LEVY, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.


46.